STATE FOUNDERS, INC., ET AL. *v.*
JOSEPH OLIVER, RECEIVER.
[No. 24, October Term, 1933.]

364

*Decided November 14th, 1934.*

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Edward L. Ward,* with whom was *Louis J. Sagner* on the brief, for the appellants.

*Theodore C. Waters* and *John H. Hessey,* with whom was *William Lee Rawls* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This proceeding was instituted by Joseph Oliver, receiver of the Great National Insurance Company, against Standard Founders, Inc., State Founders, Inc., the American National Real Estate Holding Corporation, the Berhenid Building & Loan Association of Baltimore City, Inc., Maurice Company, Inc., Merchants' Building & Savings Association, Inc., National Title Guarantee Corporation, Tri-State Investment Corporation, Henry L. Sinskey, Raymond A. Sinskey, and Maurice Eisenberg, to the end that the defendants be de-

clared to be debtors of the complainant, and, as ancillary to that relief, that the defendants discover under oath all moneys received by them from the National Fidelity Insurance Company of America and the Great National Insurance Company, and discover and account for all profits made by them or any of them as a result of certain transactions described in the bill of complaint; that moneys received from said insurance companies be declared to be impressed with a trust in favor of the complainant; that the defendants be required to account for all profits made by them from the use of money obtained from said insurance companies; that a receiver be appointed to take charge of the assets, books, and other goods and effects of the corporate defendants (except the National Title Guarantee Corporation), to collect debts due them, and to preserve and dispose of the properties belonging to them under direction of the court; that the officers of said corporation be required to deliver up to the receiver all property severally belonging to them; that the natural defendants, the two Sinskeys and Eisenberg, be enjoined from in any way intermeddling with the affairs or property of the said corporate defendants and from disposing of any evidence of stock ownership of the corporate defendants held by them or for their account; that said natural defendants be required to deliver to said receiver all property of the corporate defendants held by them; that they be restrained from disposing of a certain yacht named "Rujopa," and that said yacht be declared to be the property of the complainant; that the defendants (except the National Title Guarantee Corporation) be restrained from withdrawing any funds standing to their credit in any banking or savings institutions or building associations, and from entering any safety deposit box or other place of safe-keeping, and from withdrawing therefrom any funds or securities stored therein.

Upon that bill, with its accompanying affidavit and exhibits, the court on April 27th, 1933, appointed A. Wirt Duvall, Jr., and Joseph Oliver receivers, and enjoined the defendants, substantially as prayed, reserving to the defendants leave to move for a rescission of the order at any time

after filing their answer upon giving the complainant five days' notice of such motion. On the same day, on petition of the complainant, the court enjoined the Emerson Hotel Company, the Baltimore Trust Company, and the Equitable Trust Company from permitting Henry L. Sinskey, Raymond A. Sinskey, and Maurice Eisenberg from having access "to their safe deposit boxes" until the further order of the court, and also enjoined them and the National Central Bank and the Savings Bank of Baltimore from paying to the Sinskeys any cash deposited in said banks or trust companies. The defendants filed their answer to the bill on April 29th, 1933, and on the same day appealed to this court from "the decree" passed in this cause on April 27th, 1933. There were two orders passed on April 27th, 1933, but since both parties treat the appeal as from the order appointing receivers rather than from the order on the receivers' petition passed later on the same day, it will be so treated in this court. On May 9th, 1933, upon the petition of certain of the defendants, and upon the filing of an approved appeal bond, the court suspended and superseded the order of April 27th, 1933, as to such defendants, and directed Oliver and Duvall to return to said defendants all money and other property, including the yacht Rujopa, taken from them, and dissolved the injunction against them and the banks and trust companies affected by the second order of April 27th, 1933. From that order the complainant appealed. So that there are two appeals in this record, one from the first order of April 27th, 1933, the other from the order of May 9th, 1933, suspending and superseding that order.

The appeal from the order of May 9th, 1933, is free from difficulty. Article 5, section 33, of the Code, after providing for appeal bonds in appeals from the orders or decrees of courts of equity, further provides "and upon giving such bond the appeal shall stay the operation of all such decrees or orders; provided, however, that if in its discretion the court in which such proceedings are pending shall decide that the case is not a proper one for such stay, such court may pass an order upon such terms (as to duration, keeping

an account, giving security, etc.) as to it may seem fit, directing that the decree or order appealed from shall not be stayed by such appeal, or only so far or on such terms as the court shall therein direct." The language quoted is explicit and mandatory, and from it it appears (1) that if the trial court does not act at all, an appeal bond automatically stays the operation of the orders, or decrees, from which the appeal is taken, but (2) the court may "in its discretion" order that such bond shall not stay the operation of such orders or decrees. In this case a mere staying of the order appealed from may not have been adequate to restore to the appellants property and rights of which they had been deprived by the operation of the order appealed from, or to give to them the privileges in respect to such rights and property which, in the absence of adverse action by the court, the statute obviously intended they should have upon the filing of an approved appeal bond in a penalty fixed by the court. Certainly it was not intended that, when an appellant complies in all respects with the requirements of the statute by filing a bond in compliance with its provisions, that he should be only partially relieved from the effect of the order or decree from which the appeal was taken, and should, unless the court so directs, be compelled to submit to having his rights and property in alien control pending the appeal. In such a case it is clearly in the power and discretion of the lower court to obviate any hardship incident to such a condition by appropriate action. The word "stay," used in the statute, ordinarily means to stop, arrest, or forbear. Literally, as used in the statute, it could mean to arrest the operation of the order as of the time at which the appeal bond was filed, leaving what had previously been done under it unaffected. But such a construction would be wholly unreasonable and too narrow, for it might well be that what had been done under the order or decree prior to filing the bond would more seriously affect the appellants than anything that could possibly be done afterward. The manifest purpose of the statute was to repose in the trial court the power and the discretion to obviate any hardship incident to such a condi-

tion by taking such action in respect to the effect of the bond upon the order or decree appealed from as might be necessary to afford to the appellant the full protection offered by the statute. In *Shirk v. Soper,* 144 Md. 287, 124 A. 911, 918, this court said: "In dealing with the character of the discretion, reposed in the court passing the decree, to order that it shall not be stayed by appeal, in *Forbes v. Warfield,* 130 Md. 407, 100 A. 630, 634, this court, through Judge Thomas, said: 'The question whether in any particular case the execution of the order or decree appealed from shall be stayed by the appeal, is expressly left by the Code entirely to the discretion of the lower court, and we said in *Crownfield v. Phillips, supra* [125 Md. 1, 92 A. 1033, 1034]: "This court has no power to review the refusal of the lower court to annul the effect of the appeal, for it is a matter that is expressly left, by the statutes, to the discretion of the court where the proceedings are pending." ' *Crownfield v. Phillips,* 125 Md. 1, 92 A. 1033; *County Commissioners v. School Commissioners,* 77 Md. 283, 26 A. 115." And if in that case this court had no power to review the refusal of the lower court to annul the effect of an appeal, neither should it in such a case as this review the discretion of such a court in making complete and effective the protection provided by the statute upon the filing of an approved appeal bond, and the appeal from the order of May 9th, 1933, will be dismissed.

Turning to the appeal from the order of April 27th, 1933, it may be said, by way of premise, that upon an appeal from an interlocutory order appointing a receiver or granting an injunction, the appellate court is confined to the allegations of the bill and such exhibits as are properly a part of it, and that the averments of the bill, in so far as they are well pleaded, are taken as true. *Miller's Equity Proc.,* secs. 317, 319; *Sterback v. Robinson,* 148 Md. 27, 128 A. 894; *Shannon v. Wright,* 60 Md. 521. The question then is whether the bill states facts sufficient to support the order from which this appeal was taken.

The first seventeen paragraphs of the bill describe and

identify the parties to the proceeding, and the substance of them will be stated in narrative form.

The Great National Insurance Company was incorporated in the District of Columbia July 24th, 1926, and on February 11th, 1931, it consolidated with the National Fidelity Fire Insurance Company of America, which was incorporated in the State of Maryland on July 27th, 1929, the consolidated company being known as the Great National Insurance Company. The Great National Insurance Company, hereinafter called the Great National Company, was by its charter authorized to carry on a general insurance business and was duly authorized to operate in the District of Columbia, Virginia, Georgia, North Carolina, and South Carolina. The National Fidelity Fire Insurance Company of America, hereinafter called the Fidelity Insurance Company, was authorized to transact a fire and reinsurance business in Maryland. On November 16th, 1932, in a suit pending against it in the Supreme Court of the District of Columbia, the Great National Company was adjudicated an insolvent and Joseph Oliver appointed permanent receiver for it. On March 23rd, 1933, in a proceeding pending in the Circuit Court of Baltimore City, against the same company, the said Oliver was appointed receiver in Maryland for it, and was by that court authorized and directed to file the bill of complaint in this case.

The Standard Founders, Inc., is a Maryland corporation, incorporated on December 30th, 1930. Its charter was amended three times, and under the last amendment, made December 30th, 1931, it was authorized to issue 19,000 shares of common stock having no par value and no voting power, which was, however, preferred as to dividends "only if and when declared," known as Class A stock; and 500 shares of common stock having a par value of two dollars per share but with full voting powers, known as Class B stock, so that the control of the corporation lay in the holders of the 500 shares of Class B stock. The receiver of the Great National Insurance Company, Oliver, holds 11,835 shares of Class A stock, which the records of the Great National

Company show cost $1,133,500, and which are alleged to be all the Class A stock of said company outstanding. The only other stock of said company outstanding are 450 shares of Class B stock, held by "various individuals," but all controlled and operated by Henry L. and Raymond A. Sinskey, who also control, operate, and dominate the directors of said company. Two of the incorporators were Maurice Eisenberg, an employee of the Sinskeys, and Samuel Feitelberg, both of whom are connected with other corporations named in the bill, and Clayton W. Bordley, a "nominee" of the Sinskeys. Its office is at 213 E. Fayette Street in the City of Baltimore, which is also the office of the other corporate defendants and of Eisenberg and the two Sinskeys.

State Founders, Inc., is a Delaware corporation, incorporated in that state as the State Mortgage Company February 18th, 1926, its name having been changed to its present form by an amendment to its charter on February 11th, 1931. It too is "dominated, controlled and operated" by the Sinskeys, and its board of directors acts under their "orders and directions," and they actually control it. It was authorized to do business in the State of Maryland, but, while still doing business in that state and having assets therein, it applied to the State Tax Commission for permission to withdraw from the state and represented that it had no assets in the State of Maryland. The permission was refused and a tax was levied "upon the employment of assets of $1,000,000."

The American National Real Estate Holding Corporation was incorporated in Maryland June 25th, 1930. Two of its incorporators were Helen K. Rigdon, secretary to Howard C. Bregel, whose office is also at 213 E. Fayette Street, and Mary Kellam, bookkeeper for the Fidelity Insurance Company, and the third was Gerald J. Kerr, attorney for the Sinskeys. It had no assets so far as known to the plaintiff, and is also "dominated, controlled and operated" under the direction of the "two Sinskeys."

The Berhenid Building & Loan Association of Baltimore City is a Maryland corporation incorporated November 16th, 1923, and Maurice Eisenberg is its "resident agent,"

and it is "dominated, controlled and operated" under the direction and management of the Sinskeys. It has no assets known to the complainant.

The Maurice Company was incorporated under the laws of the State of Maryland by employees of the Sinskeys and the corporate defendants June 21st, 1932. It is "dominated, controlled and operated" by the Sinskeys, and is a "mere sham" to carry out their "schemes and plans."

The Merchants' Building & Savings Association is a Maryland corporation, incorporated "a number of years ago" as the Merchants' Building & Loan Association of Baltimore City, and is "dominated, controlled and operated" by the Sinskeys.

The National Title Guarantee Corporation was incorporated in Maryland August 1st, 1931, and its corporate acts are "dominated and controlled by the Sinskeys."

The Tri-State Investment Corporation was incorporated under the laws of Maryland July 2nd, 1931, by persons in the employ of the Sinskeys or corporations controlled by them, and is "dominated, controlled and operated by them."

In the last seventeen paragraphs of the bill, the complainant undertakes to describe a number of alleged fraudulent transactions through which the Sinskeys, acting in cooperation with Eisenberg and Feitelberg, are said to have used the eight corporations named above for the purpose of taking from the Great National Insurance Company cash and other valuable assets, leaving in their stead worthless securities and valueless obligations, and of turning over such assets to the Sinskeys for their individual use and profit. The averments found in these paragraphs are for the most part vague, confused, and general, and it is difficult to ascertain from them the precise nature and incidents of these transactions. So far as the bill permits any rational hypothesis of fraud, the theory of the complainant appears to be that the Sinskeys used the several corporate defendants as mere instruments or tools to divert assets of the Great National Company from its possession to some corporation controlled by them, and then by the exchange or sale of stock or the

loan of cash to ultimately leave such assets either in the possession of the Sinskeys or in some corporation owned and controlled by them. These transactions may be considered as separable into seven categories, and for convenience will be dealt with in that way.

1. The bill alleges that on October 8th, 1930, the National Fidelity Fire Insurance Company of America purchased 12,500 shares of the stock of the State Mortgage Company, now the State Founders, Inc., which at that time "had a market value," and on March 19th, 1931, it transferred that stock to the Standard Founders, Inc. On the same day, the insurance company agreed to purchase from the Standard Founders, Inc., 5,750 shares of its Class A stock, apparently for $575,000. So that the Fidelity Insurance Company had sold to Standard Founders 12,500 shares of the stock of the State Mortgage Company for $500,000, and had bought from Standard Founders stock for which it agreed to pay $575,000. As a result of that transaction the Fidelity Insurance Company owed Standard Founders a balance of $75,000 in cash, which it obtained through the sale of securities having a value of $82,526.41. The stock of Standard Founders was not "listed," had no market value, and "little, if any real value." It is further alleged that the transfer of the 12,500 shares of the stock of the State Mortgage Company, and the payment of $75,000 in cash to the Standard Founders, Inc., was accomplished by fraud "practiced upon the National Fidelity Fire Insurance Company of America, its officers and agents." While it is alleged that the stock of the State Mortgage Company had "a market value," there is no statement as to what the value was, and while it is alleged that the transaction was accomplished by fraud, it is not stated what the fraud was, nor what means were used to accomplish it.

2. The bill alleges that in the fall of 1931 "certain of the officers and directors of the Great National Insurance Company," who are not named, and the two Sinskeys, represented to the board of directors of the Great National Company that the controlling interest in two other insurance companies could be secured, if the purchaser could "transfer

unto them stock which was upon a dividend paying basis," and that as the stock of the Great National Company was not upon such a basis, its directors were "importuned" to buy stock in Standard Founders, Inc., which the Sinskeys said paid twenty per cent. dividends, for the "sole purpose of using the same for acquiring a controlling interest in" the insurance companies; that the Sinskeys acting for themselves and as agents for Standard Founders, Inc., and "the other corporate defendants then in existence," represented that Standard Founders, Inc., was engaged in the "petty loan business," that its business was lucrative, and that the money realized from the sale of its stock, would be used for "the purpose of making petty loans which would produce great revenue"; that, relying upon these representations, the board of directors of the Great National Company passed a resolution authorizing the purchase of stock "not to exceed $250,000" in the Standard Founders, Inc., said purchase to be made "when necessary," but only in the event that the Great National Company could secure a controlling interest in one of the two insurance companies. It is further alleged that, in violation of that resolution, "there was paid from the treasury of the Great National Insurance Company unto the Standard Founders, Inc., the sum of $158,500"; that Standard Founders, Inc., used that money together with $41,500, which "may have been a part of" funds previously received from the Great National Insurance Company, to buy 4,000 shares of the capital stock of the Colonial Trust Company of Delaware, the value of which was "so small that the price paid therefor was greatly disproportionate to its value"; that said stock was actually owned by State Founders, Inc., for which the Tri-State Investment Company acted as agent; that, upon receiving the $200,000, the Tri-State Investment Corporation paid to State Founders, Inc., $156,500, and retained $43,500; that State Founders, Inc., thereupon loaned $156,500 to one Maurice Eisenberg, one of its employees, without collateral, although said Eisenberg was wholly without financial responsibility; that said transaction, while in the form of a loan, was a mere device to defraud

the Great National Insurance Company, and that Eisenberg indorsed the check for the $156,500, and it was deposited to the personal account of Henry L. Sinskey, and of that amount $100,000 was deposited to the account of Henry L. and Raymond A. Sinskey; that of the balance $56,500 was transferred to "Henry L. Sinskey and Raymond A. Sinskey by a deposit in their names or certain trustee accounts, actually the property of Henry L. Sinskey or Raymond A. Sinskey, or both, in the Berhenid Building and Loan Association of Baltimore City, Inc., and/or the Merchants Building and Savings Association, Incorporated, which are also owned, operated, controlled and dominated by the said Henry L. Sinskey and Raymond A. Sinskey."

It is further alleged that the representations made to the directors of the Great National Insurance Company to induce them to invest $156,500 in the stock of the Standard Founders, Inc., were "false and fraudulent"; that Standard Founders had not "functioned" prior to receiving said sum of $156,500; and that it never was intended that the Great National Company should use Standard Founders stock to buy stock in either of the two fire insurance companies. The result of those interrelated transactions was to use $156,500 of the funds of the Great National Insurance Company for the purchase of stock of the Standard Founders, Inc., and ultimately to transfer all but $2,000 of that sum to the possession of the Sinskeys.

3. It is further alleged that on December 5th, 1930, the Fidelity Insurance Company loaned to the American National Real Estate Holding Corporation, which at that time had no assets of any value, $156,500; and that on December 31st, 1930, it recorded a sale of 5,071 shares of its stock to the State Mortgage Company for $368,000, but that that transaction was not completed until March 4th, 1931, after the "articles of consolidation," consolidating the Fidelity Insurance Company with the Great National Company, had been signed; that on March 3rd, 1931, the Fidelity Insurance Company sold mortgages "to the value of $25,027," and on March 4th, 1931, "apparently" purchased from State

Founders, Inc. (State Mortgage Company), 1,000 shares of the American National Real Estate Holding Corporation stock for $550,000, paying for it, from these funds, (a) $368,500, which State Founders, Inc., owed the Fidelity Insurance Company for the 5,071 shares of its capital stock, (b) $156,500, the amount loaned to the American Real Estate Holding Corporation, and (c) $25,000 from the proceeds of the sales of its mortgages. As a result of that transaction, assuming the truth of the allegations of the bill, $181,500 in cash, being $25,000 realized from the mortgages, and the $156,500 loan, was taken from the treasury of the Fidelity Insurance Company and placed in the possession of State Founders, Inc., and 5,071 shares of its stock transferred to the same corporation, in return for which the Fidelity Insurance Company received 1,000 shares of the American National Real Estate Holding Corporation, which, until the transaction described, had no assets of any value. The bill further alleges that that entire transaction was a fraud upon the Fidelity Insurance Company, "designed solely and for the purpose of enriching the defendants," especially the defendants Henry L. and Raymond A. Sinskey, and that the complainant is entitled to be "declared a creditor of the State Founders, Inc., and of the other defendants herein participating in said fraudulent transaction and receiving any of the funds so transferred by the National Fidelity Fire Insurance Company of America to the State Founders, Inc., and thereafter transferred by it to the other defendants in furtherance of the scheme to defraud the National Fidelity Fire Insurance Company of America." Referring, apparently, to the transaction set out in classifications 1, 2, and 3, the complainant alleges that "the result of these transactions" was not only to take from the treasury of the Fidelity Insurance Company the sums named above, but it enabled that company and the Great National Company, with which it consolidated, "to show on their statements amounts as issued capital stock and surpluses which permitted them to enter additional territories and broaden the fields in which they could write additional lines without having benefited their cash positions or

their ownership of investments of a readily marketable character, which policy had the effect of misrepresenting the financial position of the companies to their holders of policies or stock and to persons purchasing policies or stock subsequent to the date of the above transactions."

4. It is further alleged that the complainant "believes" that the liabilities of Standard Founders exceeds its assets, but that beginning July, 1932, and "continuing through 1932," it assigned "various and sundry" mortgages to the Maurice Company, which was incorporated for the purpose of taking such assignments, thereby divesting Standard Founders, Inc., of its assets,· and that such assets, though transferred to the Maurice Company, are the property of Standard Founders, Inc., and should be "liable for the money wrongfully obtained by the Standard Founders, Inc.," from "the Great National Insurance Company or the National Fidelity Fire Insurance Company of America." It is not alleged that the Maurice Company is insolvent, nor that it did not pay in full for the mortgages assigned to it.

5. It is further alleged that, to obtain additional money from the Great National Insurance Company, the two Sinskeys incorporated the National Title Guarantee Corporation, and "representations were made" to the Great National Company that the Title Guarantee Corporation was being organized with a capital of $1,000,000, of which $700,000 had been subscribed, and that "arrangements had been made· for a license from the Insurance Department of Maryland"; that these representations, which were made by the two Sinskeys and Howard Bregel, afterwards president of the Title Guarantee Company, were "utterly false"; that no cash subscription to the stock of "any moment" was made by any other person or corporation; that the only other possible subscriptions were effected by a transfer of the stock of the "Title Guarantee Company for stock held by" some of the defendant corporations "which were controlled and dominated" by the Sinskeys; that, relying upon these representations, the Great National Company subscribed "for $100,-000" worth of stock in the Title Guarantee Company, and

paid in that amount of cash, and that the cash so paid was ninety-five per cent. of all cash subscribed for said stock; although "it may be true" that "some of the defendant companies subscribed to stock of the National Title Guarantee Corporation by effecting a transfer of its own stock, or stock held in their portfolio"; that the interest thus acquired has, at "all times" subsequent to the investment thereof, been worth less than one-tenth of the amount of said investment; that, notwithstanding the extent of its interest in the company, the Great National Company was allowed "no voice or control" in the management of the Title Guarantee Corporation, was permitted to have no "say" in its management, and was unable to obtain from it any statement of its assets and liabilities, although demand therefor was made; that on November 15th, 1932, the complainant attended the annual meeting of its stockholders, and that, although in response to a demand made at that time it was resolved that such a statement be prepared and furnished each stockholder, no such statement has been prepared; that no statement was filed with the Insurance Department of the State of Maryland in 1933 as required by law; and that the subscription of $100,000 for the stock of the Title Guarantee Company by the Great National Company was secured by fraud and designed solely for the benefit of the two Sinskeys; and that, in consequence, the complainant is entitled to be "declared a creditor" of the Title Guarantee Corporation, and other defendants who have received any part of said sum of $100,000, or benefited thereby. It is further stated that when the $100,000 subscription was made, there was on file with the Insurance Commissioner of Maryland a statement showing that the National Title Guarantee Corporation held 8,404 shares of the stock of State Founders, Inc., valued at $313,150, and 51,579 shares of stock in the Great National Company valued at $583,-874.28; that less than six months thereafter it appeared from another statement that these assets were no longer held by the corporation, but that for them there had been substituted 5,838 shares of the Tri-State Investment Corporation valued at $583,874.28; that a statement filed December 31st, 1931

(filed apparently with the Insurance Commissioner) showed $324,146.89 cash on deposit, but that there was no "such sum" on deposit, and it is further alleged that State Founders, Inc., and Standard Founders, Inc., are owners of large "blocks of stock" in the Title Guarantee Corporation. The substance of the complaint as to this transaction is that the Great National Company was induced by false and fraudulent representations to subscribe $100,000 for stock which was not worth one-tenth of that amount. But the only representations pleaded are that at the time of the subscription $700,000 had been subscribed out of an authorized issue of $1,000,000, and that arrangements had been made for a license for the company to transact business in Maryland. There are no facts to show that either of these statements was false, but it is entirely consistent with the record that they were true. The company did do business in Maryland, and it appears that at one time it held stock in other corporations valued at $897,024.28, which it may have acquired in exchange for its own stock.

6. It is further alleged that on or about April 1st, 1933, the Title Guarantee Corporation assigned to the Merchants' Building & Savings Association, Inc., good mortgages "amply secured," and received for them $8,000, and used that fund to purchase from the Tri-State Investment Company a mortgage for $8,000 of doubtful value, and that "said transactions were conceived and engineered" by the two Sinskeys, for the purpose of transferring "a mortgage of questionable value and receiving a good mortgage in return therefor." But while it is stated that the building and savings association is dominated and controlled by the Sinskeys, it is not stated that they own any of its stock, nor that it is insolvent, nor that the transaction was fraudulent, nor is there any prayer to annul it.

7. It is also alleged that, by a resolution of the executive committee of the Fidelity Insurance Company, $5,000 each was paid by that company to Maurice Eisenberg and Samuel Feitelberg for alleged back salary, but that complainant "believes" said payments were designed to be for the use and

benefit of the Sinskeys, and the defendant corporations; that
the checks bear the indorsement of Henry L. and Raymond
A. Sinskey, and Sigmund Sinskey, an employee of the de-
fendant corporations, and that the proceeds of said checks
were used to purchase a yacht named Rujopa, which is
titled in the name of Maurice Eisenberg. It is further
stated that complainant believes that the yacht is the prop-
erty of Raymond A. Sinskey, and, having been purchased
from funds of the Great National Company, should be de-
creed to be its property. No basis is stated for complainant's
"belief," nor is it stated that the company was not indebted
to Eisenberg and Feitelberg in the amounts paid them.

It is also alleged, in substance, that the several trans-
actions referred to above were carried out in the execution of
"carefully and well planned schemes" to defraud the Great
National Company and the Fidelity Insurance Company;
that the "formation and use of the corporate defendants"
was a device to create the impression that moneys paid out
by the Great National Company and the Fidelity Insur-
ance Company were investments, whereas they were not in-
vestments but were paid out in pursuance of a plan to de-
fraud those companies, and place the sums so paid beyond
their control and management.

Complainant further, upon information, avers that records
of the "company" and "certain corporations" are being
altered, changed, and concealed under the direction of the
two Sinskeys, and that "the defendants are likely to dispose
of or conceal their assets" unless restrained by the court;
that the defendant corporations are grossly mismanaged and
their funds fraudulently applied; and that their funds and
assets will be further wasted and dissipated unless a receiver
is appointed to take charge of all of them except the National
Title Guarantee Corporation.

Finally it is alleged that the two Sinskeys have safe de-
posit boxes at the Emerson Hotel, the Baltimore Trust Com-
pany, and the Equitable Trust Company, in which are stored
sums of money obtained from the transactions described in

the bill, and that unless they are restrained from "entering" said boxes the complainant will suffer irreparable injury.

It may be said, by way of premise to a consideration of the law applicable to these allegations, that while the effect of an appeal under section 31, article 5 of the Code, from an interlocutory order granting an injunction or appointing a receiver is in some respects analogous to a demurrer to the bill of complaint for a want of equity, there is this important distinction between them, that in the case of a demurrer the test of the sufficiency of the bill is whether any part of the relief prayed is justified by the averments of the bill (*Fletcher's Equity Pl. & Pr.,* sec. 203; *Miller's Equity Proc.,* sec. 134), while, in the case of an appeal under the statute from an interlocutory order granting an injunction or appointing a receiver, the test is whether the averments of the bill are sufficient to justify the particular relief granted by the order (*Sterback v. Robinson,* 148 Md. 27, 128 A. 894).

It may be said, too, that it is a general rule of equity pleading that every bill should state the claim of the plaintiff "with accuracy and clearness," and that it "should in like manner state the injury or grievance of which he complains and the relief which he asks of the court" (*Miller's Equity Proc.,* sec. 92), and that rule is applied with "much rigor to a bill for an injunction" (*Id.,* sec. 580). In the same work the rule to be followed upon an application for an interlocutory injunction is said to be that if "the facts, as stated upon the face of the bill, be not full, and sufficiently definite and clear, in support of the right asserted, and that such right has been violated, in the manner charged, the court will not order the defendants to be restrained before they are heard in their defense." The same principles apply with equal force to a bill for a receiver. *Id.,* sec. 622. The precision and clarity generally required of the plaintiff in a court of equity in the statement of his case is strongly emphasized in cases where fraud is charged as the ground for the relief prayed. In such cases no violence of expression, repetition of epithets, nor general allegations, can supply the omission of the particular facts with respect to which fraud is predi-

cated, and a mere charge of fraud without a statement of the facts which constitute it will form no basis for relief. *Miller's Equity Proc.*, sec. 93; *Story Eq. Pl.*, sec. 252; *Daniell Ch. Pr.*, 324; *Fletcher Eq. Pl. & Pr.*, sec. 98.

Much of appellee's argument is devoted to demonstrating the thesis that a court of equity may in a proper case appoint a receiver *ex parte*. But that practice is too firmly established in this state to need either argument or authority to support it, nor is it in issue in this case. For the question here is, conceding that the court had the power to appoint a receiver *ex parte*, whether, in view of the principles just stated, it was authorized upon the allegations of the bill to pass the order of April 27th, 1933, from which this appeal was taken. By that order, without notice of any kind to any of the parties defendant, the court appointed Duvall and Oliver receivers for seven different and distinct corporations, instantly took all the business, books, assets, and property of such corporations from the control of their own officers, employees, and agents, and placed them in the custody and under the control of the receivers, enjoined the officers, agents, and employees of said corporations, the Sinskeys and Eisenberg, from retaining from the receivers any books, records, cash, or other assets of said corporations, from collecting debts due them, from negotiating their commercial paper, and from intermeddling with them in any way, commanded the Sinskeys and Eisenberg to deliver to the receivers any property belonging to said corporations then in their control, enjoined them from selling the yacht "Rujopa," but commanded them to deliver it to the receivers, restrained them from disposing of any stock certificate or other evidence of stock ownership held by them or for their account, and restrained them from withdrawing from their own safe deposit boxes "any money, stocks, bonds" or other securities or valuables contained therein. No injunction bond was required nor was any protection given the defendants, except that the receivers were required to file severally an ordinary receiver's bond in the penalty of $25,000.

The principles affecting the issuance of injunctions and

the appointment of receivers upon *ex parte* applications have been too frequently and too recently considered by this court to justify any extended discussion now. *Steel's Dept. Stores v. Buckingham,* 143' Md. 680, 123 A. 391, and cases there cited. In *Blondheim v. Moore,* 11 Md. 374, it is said: "1st. That the power of appointment is a delicate one, and to be exercised with great circumspection. 2nd. That it must appear the claimant has a title to the property, and the court must be satisfied by affidavit, that a receiver is necessary to preserve the property. 3rd. That there is no case in which the court appoints a receiver merely because the measure can do no harm. 4th. That 'fraud or imminent danger, if the intermediate possession should not be taken by the court, must be clearly proved'; and 5thly. That unless the necessity be of the most stringent character, the court will not appoint 'until the defendant is first heard in response to the application." The announcement of the law thus made has never been departed from in this court and is still the law of this state. Nor could it well be otherwise. There is no more harsh or stringent remedy known to the law than that of taking, without notice, from a person, natural or corporate, all of his or its property and assets and placing them in the custody and control of a stranger, nor is there a remedy which may result in more injurious consequences to the person affected, who may nevertheless be wholly innocent of any wrongful or improper conduct. So patent is that obvious conclusion that in some states notice is required by statute (53 C. J. 58), while in the absence of statute, in both England and America, the practice is said in *High on Receivers,* sec. 111, to "require the moving party to give due notice of the application to defendant, over whose effects he seeks the appointment of a receiver, in order that he may have an opportunity of being heard in defense, and that his property may not be summarily wrested from him upon an *ex parte* application. Even in exceptional cases of great emergency, when the relief is demanded for the prevention of irremediable injury, the courts are extremely averse to inter-

ference *ex parte,* and will ordinarily entertain the application only after notice to defendant, or after a rule to show cause." In 53 C. J. 59 it is said: "A receiver may be properly appointed without notice, and before giving the adverse party an opportunity to be heard, in, and only in, an extreme and exceptional case, in which there is a great emergency and an imperious and most stringent necessity for an immediate appointment, as where the adverse party is out of the jurisdiction of the court or cannot be found and served with notice, or, for some other reason, it is absolutely and imperatively necessary for the court to interfere, before the lapse of the time required to give notice and afford a hearing, in order to prevent loss, waste, destruction, irreparable injury, or the defeat of the petitioner's rights, or the giving of notice would jeopardize the delivery, safety, custody or control of the property over which the receivership is to be extended, and the rights of the complaining party may be amply and sufficiently protected in no other way, or by no other remedy, such as temporary injunction or restraining order."

Applying these principles to the facts alleged in the bill, in our opinion the order appealed from should not have been passed. If it be assumed that the allegations of the bill as to repeated changing of corporate names, the multiplication of corporations, all controlled by two persons, the use of such corporations for a constant and confusing shifting of corporate assets and stock, a constant collusive purpose on the part of the two persons controlling such corporations to use them as mere instruments to swindle and defraud the Great National Company, and a conspiracy between the officers of that corporation and the two Sinskeys to effect that unlawful purpose, are sufficient to establish such a *prima facie* case of fraud as to require the defendants to discover their transactions with it and to account for any moneys unlawfully obtained from it, it by no means follows that they are sufficient to authorize the court, upon an *ex parte* application, without notice to them, to take from the corporate defendants

all their business and assets and place them even temporarily in the hands of a receiver, or to deprive the natural defendants of the right to use their own property for their own purposes. And the bill in this case fails to show with the certainty and clarity requisite in such a case any emergency or necessity sufficient to justify relief so severe and stringent. There is not to be found in the bill any direct allegation that any one of the defendants is insolvent, nor is it stated anywhere that the Great National Company or the receivers have at any time demanded of them or of any of them the sums now claimed to be due or any part thereof. Nor is it alleged that the defendants are not all actually going concerns, nor is there any suggestion that they have been asked to account, nor that if asked that they could not or would not account to the plaintiff, and while there are general allegations as to mismanagement, misappropriation, and waste, the facts to support these conclusions are not stated.

It is alleged that plaintiff has been informed that records of the defendant corporations under the direction of the Sinskeys are being altered and concealed, but the source of the information is not given, nor is it even said to be credible, nor is it alleged as a fact that such records are being altered and concealed.

And when the several charges of fraud are considered categorically, they are found wholly lacking in the certainty and accuracy required to support the first order of April 27th, 1933. The complaint in respect to the first transaction is that the Fidelity Insurance Company acquired 12,500 shares of the stock of the State Mortgage property and gave that stock and $75,000 in cash for 5,750 shares of the Class A stock of Standard Founders, Inc., the 12,500 shares being valued in that transaction at $500,000. But it is not stated what the Fidelity Company paid for the 12,500 shares of stock, and, while it is said to have had "a market value," that value is not given, and although the stock in the Standard Founders, Inc., was not listed and was said to have "no market value," and little "if any real value," there is no attempt to give its real value, nor to describe its business.

And while the transaction is said to have been brought about by fraud, the facts constituting the fraud are not stated, and although plaintiff alleges his belief that Standard Founders have transferred the stock and cash so received to others, no ground for that belief is alleged.

The complaint as to the second transaction is that the Fidelity Insurance Company was induced by fraudulent misrepresentations by its own officers and agents and the Sinskeys to purchase for $158,500 stock of the Standard Founders, Inc. The misrepresentation appears to have been that the Fidelity Insurance Company could trade the stock so purchased for a controlling interest in one of two other insurance companies; that the stock was not to be purchased unless such interest could be secured; and further that the Standard Founders, Inc., was upon a dividend paying basis and doing a profitable petty loan business. It does not appear that the Fidelity Insurance Company did not acquire a controlling interest in one of the two companies, nor is it charged, except for the general allegations, that the representations were false and fraudulent, that the Standard Founders, Inc., was not upon a dividend paying basis, nor is there any statement as to what the actual value of its stock was.

The complaint as to the third transaction is that the Fidelity Insurance Company was fraudulently induced to pay $181,500 and 5,071 shares of its stock for stock of the American National Real Estate Holding Corporation which until the transaction had no assets of any value. There is no allegation that the Real Estate Corporation or State Founders was or is insolvent, and, while it is said that prior to the transaction it had no assets of value, there is no statement as to its present worth.

In respect to the fourth transaction, plaintiff states that he "believes" that the "liability" of Standard Founders, Inc., exceeds its assets, and that the transfer of its assets to the Maurice Company was designed to strip it of "most if not all its remaining assets." But no reason or ground for that

belief is given, nor is it alleged that the transfers were not made for an adequate consideration.

The complaint as to the fifth transaction in substance is that the Great National Insurance Company was fraudulently induced to pay $100,000 for stock in the National Title Guarantee Company, which was not worth one-tenth of that amount. But there is no attempt to show what the liabilities and assets of that company are, but it is stated that a statement filed by it showed cash on deposit amounting to $324,-146.89, and stock valued at $583,874.28. It is said that there was no such sum on deposit in any of the institutions set forth in the report, but there is no suggestion as to what, if any, sum was on deposit, nor is there any allegation that the company is insolvent, nor indeed was it affected by the order appealed from.

The complaint as to the sixth transaction is that the Title Guarantee Corporation sold good mortgages to the value of "approximately" $8,000 to the Merchants' Building & Savings Association, and with the proceeds bought from the Tri-State Investment Corporation a doubtful mortgage for the same sum. But that complaint is without apparent point or purpose, for while it is said to have been engineered by the Sinskeys, it is not clear how it could have benefited them, since there is no suggestion that they owned stock in any of the three corporations. Apart from that, it is not alleged that any one of these corporations is insolvent, nor is it stated that the mortgage bought from the Tri-State Company is not collectible.

The final complaint is that the Great National Company paid Eisenberg and Feitelberg each $5,000 for back salary and that plaintiff "believes" that such sums were for the use and benefit of the two Sinskeys. But no basis for that belief is alleged, for, while it is stated that the checks were indorsed by Sigmund, Henry L., and Raymond A. Sinskey, it is not alleged that the money was not due Eisenberg and Feitelberg, nor in what capacity the Sinskeys indorsed the checks. It is further stated that it was used to buy a yacht "titled" in the name of Eisenberg, but that plaintiff "believes" it is the

property of Raymond A. Sinskey, and should therefore be declared the property of the plaintiff. No ground is stated either for the "belief" or for that apparently singular conclusion.

In connection with these complaints it may be added that nowhere in the bill is there any averment that either of the Sinskeys held stock in any one of the corporations described above, and, while the bill avers again and again that the Sinskeys "dominated, controlled and operated" the several defendant corporations, no explanation is given of the manner in which the Sinskeys, who do not appear to have held any stock in them, were able to control and dominate them, nor are any of the natural stockholders of said corporations named.

Because of the uncertainty and the insufficiency of the allegations of the bill which we have indicated, the decree appealed from must be reversed.

Nothing in this opinion contained, however, is to be construed as preventing the trial court from passing such restraining orders as may be necessary to preserve intact the rights, property, and interests of the plaintiff.

Appellant also raised the point that the appellee as a mere chancery receiver has no right to bring this suit, but as the record contains nothing more than an incomplete summary of the decree of the Supreme Court of the District of Columbia, we are unable to consider that point further than to say that it will be assumed that the determination of the trial court, which had before it a complete copy of the decree, on that point was correct.

> *Appeal from order of May 9th, 1933, dismissed, with costs to appellee, and order of April 27th, 1933, reversed, with costs to appellant.*