THE WENSTROM CONSOLIDATED DYNAMO AND MOTOR
COMPANY OF BALTIMORE CITY *vs.* LYTTLETON B.
PURNELL.

*Subscription to Shares of Stock—Rescission—Fraudulent
misrepresentation—Insufficiency of Evidence.*

In a bill filed for the purpose of having a contract of subscription
to the capital stock of the defendant corporation rescinded on
the ground that it had been obtained by the false and fraudulent
misrepresentation of the agent of the corporation, the plaintiff
charged that said agent had represented that three thousand five
hundred shares of the capital stock of the company had been
sold for not less than fifty dollars per share, and that relying
entirely on such representation he had agreed to purchase a
hundred shares of the stock; that contrary to such representa-
tion, he had since discovered that a portion of the said three
thousand five hundred shares had been sold for less than fifty
dollars a share. There was an irreconcilable conflict between
the testimony of the plaintiff and that of the agent, and they
were the only witnesses who testified to the facts of the transac-
tion itself. It was in evidence, however, that after having had
two interviews in respect of the subscription, the plaintiff at a
third interview, sought by himself, and after the subject had
been fully talked over between the parties, requested the agent
to put down in writing what he had said. This was done, and
the memorandum then and there made, and furnished to the
plaintiff, did not contain the statement that no part of the three
thousand five hundred shares of stock had been disposed of for
less than fifty dollars per share. Subsequently the plaintiff
signed the subscription list in which it was stipulated that no
one should be bound for his subscription until twenty-five hun-
dred shares had been subscribed for at fifty dollars per share.
HELD:

1st. That, in such case, the *onus* of proof is on the plaintiff, who
seeks to set aside an executed or partly executed contract, to
establish the alleged fraudulent misrepresentations by clear and
satisfactory proof; and that the fraudulent misrepresentations

8                    v. 75.

alleged actually deceived the plaintiff, and were the occasion of and brought into existence the contract.

2nd. That in Courts of equity, and especially on allegations of fraud, if the allegations of the bill be supported by the testimony of a single witness *only*, and his testimony is positively and precisely denied by a witness for the defendant, the bill, ordinarily, must be dismissed, unless there be corroborative evidence of the testimony of the witness for the plaintiff, supplied by letters or other documents in the case.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., ROBINSON, IRVING, FOWLER, McSHERRY, and BRISCOE, J.

*John N. Steele,* and *Edgar H. Gans,* for the appellant.

Reference was made to the following authorities: *McShane vs. Hazlehurst,* 50 *Md.,* 119; *Atwood vs. Small,* 6 *Clark & Fin.,* 232; *Smith vs. Kay,* 7 *H. of Lords,* 775; *Evansville Railroad Co. vs. Posey,* 12 *Ind.,* 363; *Thornburgh vs. Newcastle, &c., Railroad Co.,* 14 *Ind.,* 499; *Miller vs. Hanover Junction & Susq. R. R. Co.,* 87 *Penn. St.,* 95; *Walker vs. Mobile & Ohio R. R. Co.,* 34 *Miss.,* 246; *Conn. & Pass. Rivers R. R. Co. vs. Bailey,* 24 *Vermont,* 465; 14 *Am. Law Rev.,* 192; *Redgrave vs. Herd,* 20 *Ch. Div.,* 21-2; *Smith vs. Chadwick,* 20 *Ch. Div.,* 27-44; *Heyman vs. European Central Railway Co., L. R.,* 7 *Eq. Cases* 154-167; *Pulsford vs. Richards,* 17 *Beav.,* 99; *Vane vs. Cobbold,* 1 *Exch.,* 797; *Cook on Stockholders, sec.* 149; *Craig vs. Phillips,* 3 *Ch. Div.,* 722; *Brant vs. Ehlen, et al.,* 59 *Md.,* 29; *New Brunswick and Canada Railway Co. vs. Conybeare,* 9 *H. of Lords,* 724; *In re Gold Co., L. R.,* 2 *Ch. Div.,* 701-712; *Scovill vs. Thayer,* 105 *U. S.,* 143.

*C. I. T. Gould,* and *Randolph Barton,* for the appellees.

The following authorities were referred to: 1 *Story's Eq.,* (13th *Ed.,*) page 204, *note A; Capel vs. Sims,* 58 *L.*

Wenstrom Consolidated Dynamo and Motor Co. *vs.* Purnell.

*T. Rep.*, (*N. S.*,) 807; *Ormison vs. Smith*, 59 *L. T. Rep.*, (*N. S.*,) 627; *Henderson vs. Lacon*, *L. R.*, 5 *Eq. Cases*, 249; *Ross vs. Estates Investment Co.*, 3 *Chy. Appeals*, 682; *Mead vs. Bunn*, 32 *N. Y.*, 275; *Rawlins vs. Wickham*, 3 *De Gex & J.*, 304; *Cook on Stocks and Stockholders*, sec. 45, (*Note 4*,) and sec. 147; *Directors of Central Railway vs. Kisch*, *L. R.*, 2 *H. L. App. Cases*, 99; *Taymon vs. Mitchell*, 1 *Md. Ch. Dec.*, 392; *Hays, et al. vs. Hollis*, 8 *Gill*, 363; 1 *Story's Equity*, page 219, note; *Roman vs. Mali*, 42 *Md.*, 533; *National Park Bank vs. Lanahan*, *Trustee*, 60 *Md.*, 510.

ALVEY, C. J., delivered the opinion of the Court.

The plaintiff below, the appellee here, filed his bill against the appellant, and E. L. Tunis, the defendants below, for the purpose of having rescinded his contract of subscription to the capital stock of the defendant corporation, procured from him, as alleged, by the fraudulent misrepresentation of E. L. Tunis, the agent and one of the principal promoters of such corporation. By the decree of the Court below, the contract of subscription was rescinded, and declared null and void; and the corporation defendant was decreed to pay back to the plaintiff the amount of money paid on the shares of stock subscribed for, with interest from the date of such payment by the plaintiff. But as to the agent and promoter, by whose alleged fraudulent misrepresentation the subscription of the plaintiff to the stock of the corporation was procured, the bill was dismissed.

The facts of the case, such as are material to the questions involved, are these: There were formerly two manufacturing electric companies incorporated; the first, known as the Wenstrom Northern Electric Company, incorporated under the law of the State of New York, and was owner of all the patent rights for the manufacture of dynamos and motors, according to the invention

and patent right of Jonas Wenstrom, of Sweden; and the second company, known as the Southern Electric Company, incorporated under the laws of this State, was organized for the purpose of working the same patent rights in the southern territory; but this latter company was required to pay largely for the privilege of using the patent rights owned by the former company. In the early part of the year 1890, these two companies practically consolidated, and formed and organized the Wenstrom Consolidated Dynamo and Motor Company, of Baltimore City. The capital stock of this consolidated company consisted of 10,000 shares, of the par value of $100 each, making a capital of $1,000,000. E. L. Tunis, one of the defendants, was one of the directors, and the president of the company. Of the 10,000 shares of stock, H. C. Tunis, a brother of the president of the company, subscribed for 9,993 shares, payable in the assets of the two original companies, which had been vested in him for the purpose of effecting the arrangement, and which consisted of all the patent rights, good-will, diagrams, patterns, machinery, drawings, book accounts, etc., of the two companies. The shares so subscribed for were issued as fully paid up and non-assessable stock, in exchange for the assets of the two former companies. This subscription appears to have been made and accepted as being in pursuance of that provision of the general incorporation law of this State, (*Code, Art.* 23, *sec.* 61), which authorizes subscriptions to stock to be made in property. Immediately upon the making this subscription, H. C. Tunis transferred to two trustees for the benefit of the company, 5,000 shares of this stock subscribed for by him, to be sold on account, and for the benefit, of the company, and the residue of the stock was held by him. Of the shares thus retained by H. C. Tunis, he gave to five of the directors of the newly organized company 50 shares each for serving as directors for the first

year.    There is no question, however, made here on this transaction.    But, after the organization of the corporation, some time in April, 1890, several members of the board of directors, including the president, E. L. Tunis, took or purchased of the company stock at $10 per share, the whole of such purchases aggregating 700 shares. Whether the stock had a marketable price at that time, or whether any of the stock that had been transferred to the trustees for the benefit of the company had been sold prior to that time for more than $10 per share, does not appear.    But a short time thereafter subscription lists were circulated for subscriptions to the stock at the fixed rate of $50 per share; such subscriptions not to be binding until 2,500 shares of the stock held by the trustees had been subscribed for at that rate.    About the middle of July, 1890, one of these subscription lists was subscribed by hand and seal of the plaintiff for 100 shares of the stock, at $50 per share; and thereupon he paid the sum of $2,990, part of the price.    It is this subscription that is in controversy, and which is alleged to have been obtained from the plaintiff by the false and fraudulent misrepresentations of E. L. Tunis, the president of the company.

The bill was filed on the 20th of November, 1890.    It alleges that the plaintiff, in July, 1890, was solicited by E. L. Tunis, the president of the defendant corporation, to purchase from the trustees appointed by it, some of its shares of stock; and that after some hesitation, and relying upon the representations of said Tunis, he agreed in writing to purchase 100 shares of the capital stock of the company, of the par value of $100 per share, for the sum of $50 per share, or a total of $5,000, payable in instalments as they should be demanded.    "That at the time of said purchase said Tunis represented to your orator that the capital stock of said company was $1,000,-000, consisting of 10,000 shares of the par value of $100

per share; that $500,000 had been paid for the patent rights and properties of the northern and southern companies; that 5,000 shares had been placed in the hands of trustees to be sold for working capital, *and that* 3,500 *of these shares had been sold for not less than* $50 *per share.* That your orator relied entirely on the representations so made, and would not otherwise have agreed to purchase said 100 shares of stock."

The bill then proceeds to charge, (1st) that the plaintiff had since discovered that $500,000 had not been paid for the patent rights and properties of the northern and southern companies, and that in fact no cash at all had been paid, but that they were purchased by shares of stock in the defendant company; a large portion of which was given to the promoters of said company for their services in organizing the same; and, (2d) that the plaintiff had since discovered, contrary to the representation made to him by said Tunis, that a portion of the said 3,500 shares of stock had been sold for less than $50 per share. The plaintiff then makes the allegation that the representations were falsely and fraudulently made, for the purpose of inducing, and did induce, the plaintiff to subscribe for said shares of stock. And he therefore prays that the contract of subscription may be vacated and declared void; that the money paid on the subscription be restored to him; that the company be enjoined from suing at law upon the contract of subscription, and for general relief.

As will be observed, the grievance complained of is the positive false assertions made of particular facts, upon the faith of which assertions the plaintiff relied and was induced to act to his injury; and not the wilful, silent suppression of facts that ought to have been disclosed.

The defendants, by their answers, utterly deny all fraud or misrepresentation charged in the bill, as having

been practised in procuring the plaintiff to subscribe to the stock of the company; and they aver that all the material representations made by the said Tunis were substantially true, and that the plaintiff was in no manner deceived thereby.

With respect to the first of the alleged misrepresentations, that is, that $500,000 in money had been paid by the company for the patent rights and property of the two original companies, and not in the stock of the defendant company, the proof failing to support the allegation, it has been abandoned in the argument here. The only alleged misrepresentation therefore, that is presented on this appeal for inquiry, is that in regard to the previous sale of stock of the defendant company for a price less than $50 per share.

This being a question of fraud, the principle is well settled that the *onus* is upon the plaintiff, who seeks to set aside a contract executed or partly executed, to establish the alleged fraud by clear and indubitable proof. For the Court will not, as said by Judge STORY, rescind the contract without the clearest proof of the fraudulent misrepresentations, and that they were made under such circumstances as show that the contract was founded upon them. 1 *Sto. Eq. Jur.*, sec. 200. The principle is well and aptly stated by the Supreme Court of the United States, in the case of *Atlantic Delaine Co. vs. James*, 94 *U. S.*, 207, 214. It is there said "that the cancelling an executed contract is an exertion of the most extraordinary power of a Court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured thereby." And this principle applies as well in the case of a contract only partly executed, as where it has been completely performed.

It is now settled, that where a subscriber to stock has been deceived and induced to enter into a contract of subscription, by misrepresentation and fraud of an agent acting for the corporation, such contract, while not absolutely void, is voidable, at the election of the party deceived; and he will be entitled to have the contract of subscription rescinded and declared void, and to have restitution made of all money paid thereon, provided he elects to repudiate the contract at once upon the discovery of the fraud, and he is guilty of no unnecessary delay in coming to a Court of equity for relief. This relief will be afforded even after the complete execution of the contract, if the rights of creditors, or of innocent third parties, do not intervene, and give rise to equities superior to those of the stockholder alleging himself to have been defrauded. But in all such cases the rule is uniformly declared and applied, that the particulars of the misrepresentations and fraud must be distinctly alleged, and fully and clearly proved, to entitle the party to relief; and that relief will only be granted in those cases where it plainly appears that the misrepresentation or undue suppression of material facts actually occasioned and brought into existence the contract. *Hallows vs. Fernie*, 3 *Ch. App.*, 467 ; *New Brunswick & Canada Railway Co. vs. Conybeare*, 9 *Ho. L. Cas.*, 711; *Houldsworth vs. City of Glasgow Bank*, 5 *App. Cas.*, 317; 1 *Moraw. Corp.*, secs. 100, 101 *and* 102, and cases there cited. And while each case must depend upon its own particular facts for decision, we may refer, for a clear and distinct enunciation of the principle applicable to this class of cases, to the opinion of Sir John Romilly, M. R., in the case of *Pulsford vs. Richards, 17 Beav.,* 96. In that case, which was a bill in equity, like the present, to rescind a contract for shares for alleged false representations upon the faith of which the shares had been taken, the Master of the Rolls, in the course of his

opinion said: "With respect to the character or nature of the misrepresentation itself, it is clear, that it may be positive or negative; that it may consist as much in the suppression of what is true as in the assertion of what is false; and it is almost needless to add that it must appear, that the person deceived entered into the contract on the faith of it. To use the expression of the Roman law (much commented upon in the argument before me), it must be a representation *dans locum contractui*, that is, a representation giving occasion to the contract; the proper interpretation of which appears to be, the assertion of a fact on which the person entering into the contract relied, and in the absence of which, it is reasonable to infer, that he would not have entered into it; or the suppression of a fact, the knowledge of which, it is reasonable to infer, would have made him abstain from the contract altogether." The bill in that case proceeded upon the ground that the prospectus of the company was deceptive, in respect to the allotment and appropriation of the stock of the company, both by the suppression of what was true, and the positive suggestion or representation of what was false, though it was determined that neither was sufficiently made out to entitle the plaintiff to relief.

The first question here, on the facts of the case as stated in the bill, is whether the alleged misrepresentation, if proved, was material and of a nature to induce the plaintiff to enter into the contract of subscription? Of that we entertain no doubt. The allegation is, not of a silent suppression or non-disclosure of material facts, but that there was an affirmative representation that no part of the 3,500 shares of the company's stock, held in trust for it, had been sold for less than $50 per share, and that it was upon the faith of that representation that the plaintiff subscribed for the 100 shares of the stock of the company; which representation, as the

plaintiff alleges, he subsequently ascertained was false and fraudulently made. That, in truth, 700 shares of the 3,500 shares, had been previously sold to the directors of the company, at $10 per share. Now, it is quite clear, we think, that if this allegation be fully and clearly supported by the proof, as between the plaintiff and the company, the former would be entitled to a rescission of the contract of subscription, and to a restitution of all money paid thereon,—assuming, of course, that the bill had been filed in due time after the discovery of the fraud. It has been held, that if a person is induced to take shares by a false representation that another person had become a shareholder; or that certain persons had agreed to act as directors of the company; or that of the whole capital stock placed for market more than half had been allotted or subscribed for, when in fact the party said to have agreed to take more than half of such stock had only signed a paper to take more than half the shares conditionally, and under the arrangement made he ultimately accepted by allotment a small number of shares only; such false representations afforded ground for avoiding the contracts of subscription. *Ross vs. Estates Investment Co.*, 3 *Ch. App.*, 683; 1 *Moraw. Corp.*, sec. 106. The reasons upon which those decisions were founded would seem to be, in all respects, quite applicable to this case, as alleged in the bill of the plaintiff.

But the question remains, does the proof establish clearly and with certainty the facts as alleged in the bill? There were but two witnesses to the transaction involved—the plaintiff and Tunis. The former testified in his own behalf, and Tunis for the defendants; and there is a sharp conflict in the testimony of these two witnesses, as to the main facts of the alleged misrepresentation. The plaintiff swears positively that the misrepresentation complained of, in regard to the sale

of the stock for not less than $50 per share, was made, and repeated, by Tunis, and that it was upon the faith of that representation that he entered into the contract of subscription; while, on the other hand, Tunis is equally positive in swearing that no such misrepresentation was made by him.

It appears that, previous to the subscription by the plaintiff, there were three separate interviews held, at different places, by the plaintiff and Tunis, in regard to the stock; and it was upon those occasions, according to the testimony of the plaintiff, that the misrepresentation was made by Tunis. After the second interview, the plaintiff informed Tunis by note that he had concluded not to subscribe for the stock; and the third interview, which happened sometime afterwards, seems to have been sought by the plaintiff himself, at the office of the company. During this last interview, and after the subject had been fully talked over between the parties, the plaintiff requested Tunis to put down in writing *what he had said, so that he, the plaintiff, could look over it.* This was done, and the memorandum then and there made by Tunis was handed to the plaintiff, and which has been produced in evidence. That memorandum is as follows: "Cap. stock, $1,000,000; $500,000 was given for the patent rights and properties of all kinds of the Northern and Southern companies. And $500,000 was put in the hands of trustees to be sold for working capital. $350,-000 of the trustee stock has been disposed of, and the balance will be held by the company." According to the testimony of Tunis, this memorandum embraces substantially the entire representation made to the plaintiff. And with this memorandum in hand, furnished upon his own request, and as the basis of his action, after all the previous conversations and representations as to the disposition of the stock and the affairs of the company, it would seem to be most remarkable that the plaintiff

should act upon that memorandum, as he says he did, when the very material fact upon the faith of which he says he made his subscription, was omitted from the paper,—namely, that no part of the 3;500 shares of stock had been disposed of for less than $50 per share. It is at least reasonable to suppose that, upon the receipt of the memorandum, the plaintiff would at once have objected, that the representation which is now alleged as the material, deceptive misrepresentation of fact, had been entirely omitted. He would most naturally, and, as it seems to us, most certainly, have said to Tunis, this memorandum does not embrace the facts as you have stated them to me verbally. But, instead of that, some two or three days after receiving the memorandum, and after the fullest opportunity of comparing the statements therein made with the previous verbal statements of Tunis, the plaintiff signed the subscription list, which in express terms stated, that the parties did thereby agree to subscribe to the number of shares of paid-up non-assessable stock, set opposite their respective names, the par value of which was $100, at $50 per share, it being stipulated that no one should be bound for his subscription until 2,500 shares of said stock had been subscribed for, at said rate. It was upon this subscription that the plaintiff at once paid down $2,990; and within a month or two thereafter, and after he had learned that some portion of the stock had been sold for less than $50 per share, he proposed and offered to sell his stock, first at $60 and then at $50 per share; thus showing that he was not at that time relying upon the alleged false and fraudulent representation as cause for avoiding the contract of subscription.

On the testimony, as presented, with the irreconcilable conflict as between the only two witnesses testifying to the facts of the transaction itself, and the strong inference to be drawn from the written memorandum

furnished the plaintiff as the basis of his action, it is impossible for this Court to conclude, that the case as stated by the plaintiff in his bill has been clearly and with certainty established. For it is a well settled principle in Courts of equity, and especially on allegations of fraud, that if the allegations of the bill are supported *only* by the testimony of a single witness, and his testimony is positively and precisely denied by the defendant on oath, or a witness in his behalf, the bill will be dismissed, unless there be corroborative evidence from letters or other documents in the case. *Smith vs. Kay*, 7 *Ho. L. Cas.*, 751, 760. Here all the corroboration furnished by the written evidence is of the testimony given on behalf of the defendants. The testimony of the witness, Hopkins, does not profess to be as to facts that belonged to or actually occurred in the transaction involved in this case; and from the very uncertain and indefinite character of that testimony, even conceding it to be admissible as against the defendant corporation, a question that we do not decide, it would afford no corroborative force to the testimony of the plaintiff; nor would it seriously impeach or derogate from that of the witness Tunis, especially as there was no proper foundation laid for an attempted impeachment of his testimony. The bill having been dismissed as to Tunis, he thereupon ceased to be a party, and was therefore not affected as such by the decree. His position in the case is simply that of witness.

Upon the view we take of this case, it becomes unnecessary to examine into either the question of the confirmation of the contract by the plaintiff, or that of laches in filing the bill. We shall reverse the decree below, and dismiss the bill with costs.

*Decree reversed, and*
*bill dismissed, with costs.*

(Decided 17th December, 1891.)

ROBINSON, J., delivered the following dissenting opinion:

I fully agree with the majority of the Court as to the well settled principles of law by which this case is to be governed. But I do not agree to the conclusion reached by them as to the facts. On the contrary, the proof satisfactorily shows, I think, that the plaintiff was induced to subscribe for the stock in question by the fraudulent representations made to him at the time, and having made such subscription upon the faith of these fraudulent representations, he is entitled to a rescission of the contract and restitution of the money paid by him under it. The decree of the Court below, therefore, in my opinion ought to be affirmed.

(Filed 17th of December, 1891.)