STANDARD FOUNDERS, INC., ET AL. *v.* JOSEPH OLIVER, Receiver

BERHENID BUILDING AND LOAN ASSOCIATION, ET AL. *v.* JOSEPH OLIVER, Receiver

[Nos. 32-41, January Term, 1935]

318

*Decided April 3rd, 1935.*

The causes were argued before BOND, C. J., OFFUTT, PARKE, SLOAN, and SHEHAN, JJ.

*Edward L. Ward* and *Eldridge Hood Young*, with whom were *Louis J. Sagner* and *Young & Crothers* on the brief, for the appellants.

*Theodore C. Waters* and *William L. Rawls*, with whom was *John H. Hessey* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

This appeal brings up, at a second stage, the litigation before the court on the appeals reported in State Founders v. Oliver, 165 Md. 360, 169 A. 59. The former appeals arose from an *ex parte* appointment of receivers by the Maryland court, impounding of assets and books, and other relief, on a bill seeking a remedy of an alleged despoiling of the Great National Insurance Company by the defendants named; and this court, concluding on the

main one of those appeals that the averments in the bill of complaint on which the court below acted were in important respects insufficient to support the granting of the relief *ex parte,* reversed the order. The second of those appeals, from an order staying as to some defendants the appointment of the receiver and possession of property by him, was dismissed, and it has no bearing on the present appeals.

These present appeals have been entered by ten defendants, or groups of defendants, from actions by the court below after the filing of an amended bill. The first is from an order or decree of September 13th, 1934, overruling demurrers to the bill, filed by eight defendants; the second, from an order of September 19th, 1934, impounding assets in the hands of the appellants, two building and loan associations; and the remaining eight appeals are from the overruling of motions by defendants to rescind the order of September 13th in so far as it overruled the demurrers.

The amended bill differs from the original bill in that it omits some of the claims made in the original, and differs in the degree of particularization of its averments. To a large extent these averments are now supported by exhibits of documents of the transactions complained of, and are, besides, explained in detail and at length, so that the questions are of the sufficiency of fully exhibited transactions rather than of characterizations of them. The question of the effect of the transactions as outlined in the original bill was expressly left undecided on the previous appeals.

As was explained in the opinion on those previous appeals, the complaint in sum and substance is that two men, Henry L. Sinskey and Raymond A. Sinskey, his brother, and their associates, in the years 1930 and 1931 wrongly diverted funds from corporations in their control consolidated under the name of the Great National Insurance Company and now in the receiver's hands, and by shifting those assets under various forms through the agency of corporations and individuals which they were

able to control and use for the purpose, appropriated the assets to themselves. The bill charges also an effort to build up by the process a false appearance of ownership of assets in the consolidated company for business advantages. And like the original bill, the amended bill of the receiver, filed in pursuance of an order of the Maryland court, seeks an undoing of the transactions and a return to the receiver of the assets of the despoiled corporation. It seeks more specifically (1) discovery of amounts received as a result of the alleged transactions, (2) a declaration of indebtedness to the complainant for them, (3) that the sums be impressed with trusts for the receivership, (4) that there be a discovery and an accounting for them, (5) that a receiver be appointed to take possession of all the property, books, and effects of the corporate defendants, and to preserve them, (6) that the officers, agents, and employees be required to deliver them up, (7) that the individual defendants be restrained from withholding or intermeddling with any debts or obligations of those corporations, or (8) from selling any stock or obligations of the corporations, and (9) be required to deliver to the receiver any and all the corporate assets, (10) that withdrawal by the defendants from any deposits by them be restrained, and (11) that custody of such of all these things as were then in the hands of the receiver be continued by him.

The order of court on the demurrers sustained those of the two building and loan associations, the Berhenid and the Merchants', to the entire bill, thus releasing them as defendants to the bill, and the complainant receiver has not appealed from that action or from any other action of the court. The demurrers of the remaining eight defendants, the Standard Founders, Inc., the State Founders, Inc., the Maurice Company, Inc., the Tri-State Investment Company, Henry L. Sinskey, Raymond A. Sinskey, Maurice Eisenberg, and Samuel Feitelberg, were sustained in part and overruled in part, sustained, that is, as to a twenty-seventh paragraph of the bill which attacked payments of $5,000 found made to each of Maurice

Eisenberg and Samuel Feitelberg, for arrears in salary payments, and as to the prayers in the bill numbered above 5, 6, 7, 9, and 10; and to all other parts of the bill of complaint the demurrers were overruled.

After the action on the demurrers by which, as stated, the two building and loan associations were released as defendants to the bill, the court, upon petition of the receiver, by an order of September 19th, 1934, six days after the signing of the order on the demurrers, impounded in their hands any funds on deposit with them for the accounts of the defendants alleged to have been participants in the shifting and wrongful appropriation of assets. And that order forms the subject of the second appeal, by the two associations.

Later in the same year, 1934, the remaining eight defendants, whose demurrers had been overruled, filed each a separate motion for rescission of the order of September 13th, on the demurrers, and for dismissal of the bill of complaint, and from the overruling of each motion another appeal was entered. The motions attack the right of the receiver to maintain the bill, setting up additional facts in opposition to its maintenance.

In testing the sufficiency of the averments, the court is not, of course, to look for proof of them, but so far as they are clear and definite to take them as sufficient if, supposing them to be established by proof or by admission, they would show the remediable wrongs contended for. *Upman v. Thomey*, 145 Md. 347, 355, 125 A. 860. The averments and exhibits do include evidentiary material, with the natural effect of extending the argument into questions of probative force. *Safe Deposit Co. v. Coyle*, 133 Md. 343, 351, 105 A. 308.

The Sinskey brothers are alleged to have maintained offices at 213 East Fayette Street, in Baltimore, and to have had a number of employees there, and to have organized and maintained at the same place a number of corporations in their control and management. And these individuals and corporations are alleged to have served as channels for the diversion and appropriation of assets

as stated. These persons are named and described in the bill as having been in the Fayette Street offices, and to have been used directly or indirectly through corporations as officers and otherwise: Howard C. Bregel, an attorney; his secretary, Helen K. Rigdon; Sigmund Sinskey, an employee of the Sinskey brothers and of some of the corporations; Samuel Feitelberg, a cashier and bookkeeper employed to some extent for all the corporations; Maurice Eisenberg, a solicitor and appraiser of properties; Barbara F. Woodward, an employee; Marie A. Flick, a stenographer; Marie A. Segrist, a telephone operator; Mary M. Kellam, a bookkeeper; Ethel M. Bird, personal secretary of Raymond A. Sinskey; and Joseph Horacek, an examiner of titles to real estate. Others whose names were used, but whose places of business are not stated, were Clayton W. Bordley, an examiner of titles to real estate, Morton P. Wolman, M. B. Levin, Arthur I. Klein, and B. W. Gatch, who are not described except as aids in the passing of assets without any interest of their own in them, and in some instances without their knowledge. Descriptions of the defendant corporations, and explanations of the control of each one respectively, are given in the bill, and they may be recited further in connection with the averments of particular diversions and appropriations of funds, except for the preliminary statements that all of those corporations were located at the same Fayette Street offices and that the records of all were kept chiefly by Feitelberg as clerk, the cash receipts for all having been entered by him on one sheet and subsequently segregated in books of the separate corporations. Because of shifting of loose-leaf sheets of these corporations, it is averred, it is impossible to prepare a financial statement of any one corporation as of any particular date, and the maintenance of interchangeable records aided in the manipulations complained of. Some of the records of one of the corporations, Standard Founders, Inc., were partly destroyed by fire at the Fayette Street offices during the night after

the appointment of receivers in Baltimore on April 27th, 1933.

The grounds of complaint, remaining after the rulings on the demurrers, are divided by the bill into three alleged diversions of funds and appropriations of them.

The first in order is this: The Great National Company, now in the receiver's hands, was a consolidated corporation composed of two corporations in 1931, a District of Columbia corporation and a Baltimore corporation. And it is averred, in brief, that shortly before the consolidation was effected, the Sinskey brothers caused that Baltimore corporation to buy valuable stock from one of their other corporations, and then to exchange the purchased stock for valueless stock of still another of their corporations recently incorporated, and make a payment of $75,-000 to boot, and that thereafter they, the Sinskey brothers, passed both the valuable stock and the $75,000 through several merely formal transactions into their own possession or control. The transaction as described is much involved, and is presented in the bill with more than necessary detail.

For the exchange in this first act of despoilment, it is averred, Henry L. Sinskey and Raymond A. Sinskey and their associates utilized two corporations with names of some similarity, but which may be designated as the State Company and the Standard Company.

The State Company had been incorporated in the State of Delaware in 1926, under the name of the State Mortgage Company, and the name was changed to State Founders, Inc., on February 11th, 1931. Its officers, and the executive committee, at that time were Henry L. Sinskey, president; Howard C. Bregel, vice-president, and Morton Wolman, secretary and treasurer; and these, together with eleven others not parties to this proceeding, constituted the board of directors until five of them resigned on July 3rd, 1931, and left their places on the board unfilled. This corporation, then, and at the times of the transactions complained of, was, according to the averments of the bill, "controlled by Henry L. Sinskey

through stock ownership and as president of said corporation, the other officers and directors of said corporation being mere nominees or straw men in the hands of the said Henry L. Sinskey, who was the actual head of said company acting in conjunction with Raymond A. Sinskey, his brother." The acts of the corporation were in fact the acts of Henry L. Sinskey and Raymond A. Sinskey, who used the corporation as an instrument for the accomplishment of their purposes in the transactions complained of. What was the arrangement of stock issues of this corporation, and how much Henry L. Sinskey and his brother held, and what assets the corporation had, if any, are not stated in the bill. Its stock had a market value of from $35 to $38 a share; and it was the valuable stock in the exchange.

The Standard Company was incorporated under the name of the Standard Founders, Inc., in Maryland, on December 30th, 1930, to engage in the business of petty loans. It, too, had its office at 213 East Fayette Street. There were three amendments to its charter, the last on April 11th, 1931. The incorporators were employees of Henry L. Sinskey and his brother at 213 East Fayette Street, that is to say, Samuel Feitelberg, Maurice Eisenberg, and Clayton W. Bordley, and these were the officers and directors after the organization of the company. They subscribed together to ten shares of stock of a total par value of $1,000. By the last amendment to the charter, two issues of common stock were provided for, one known as Class A, of 19,500 shares of no par value, and with no voting privilege, and the other, known as Class B stock, of 500 shares at two dollars each, with voting power. By exchange of their certificates the three incorporators, who had subscribed the amount of $1,000, were made owners of all of the Class B stock, and it still stands in their names on the books of the corporation. There was, however, an interval of nearly ten months in 1931 when, during transactions later reviewed, the stock did not stand in their names. These persons, it is averred, were without any financial interest in the company, but were nomi-

nees and straw men, the actual interest and management being in Henry L. Sinskey and his brother at their Fayette Street offices, Eisenberg, as already stated, employed as solicitor and appraiser for the Standard corporation, Feitelberg as cashier and bookkeeper for it, and Bordley as examiner of titles of properties on which the corporation might make loans. And as to this corporation, also, it is averred that the control rested entirely in the two Sinskeys, and was availed of by them for accomplishing the wrongful transactions. The Class A stock of this corporation was unissued up to the time of the exchange made with it, and, of course, had no market value. The corporation had been in existence only two months and a half when the exchange took place. Its business was limited by lack of capital, and it is alleged in one place that it did not actively engage in the business of petty loans and was not prosperous.

The State Company, the stock of which was valuable, had in 1929 promoted the organization of a National Fidelity Fire Insurance Company, one of the two corporations later consolidated, as an investment for the State Company, and purchased $200,000 of its stock, thus vesting control of the National Fidelity Company in the State Company. By a vote of the directors of the State Company on January 23rd, 1930, those directors became the directors of the new National Fidelity Company. And in 1931 there was an executive committee of Howard C. Bregel, Eldridge Hood Young, Edward A. Gross, Morton Wolman, and Henry L. Sinskey, the vote of any two of whom, according to a provision in the by-laws, was to be effective. In November of 1930 the board of directors empowered the executive committee to appoint some person to arrange the consolidation or merger with the Great National Company, of Washington, and the committee appointed Raymond A. Sinskey.

At the time of the consolidation, the two constituent corporations had two officers in common, and two members of the executive committees in common, Howard C. Bregel and Spencer B. Curry, but their directors other-

wise were different persons. The consolidation was finally arranged on February 11th, 1931, to be effective on April 17th, 1931. And the consolidated company succeeded to ownership of all the rights and assets of the constituents. The name Great National Insurance Company was used for the combined corporation, and Washington was specified as its home office, but in point of fact all the records and possessions were removed to Baltimore and the office of the Sinskey brothers. And this consolidated company, having in that year accumulated losses of $862,500, $425,-000 of which, in cash, as it is averred, having been passed from its treasury to the defendants, was placed in the hands of the receiver in Washington, and further proceedings to the same end were had as outlined in the earlier opinion in 165 Md. at page 360. The object of the appointment was not dissolution of the corporation, and the receiver is a chancery receiver and not a statutory one. The courts in both Baltimore and Washington authorized him to collect the assets, bringing any and all actions found necessary for that purpose.

The purchases and the exchange of stock were then made by these three corporations; and the details, as set out in the bill, may be summarized thus: On October 8th, 1930, before the consolidation of the two insurance companies had been effected, and a month before the first mention of the project of consolidation in the minutes of the National Fidelity Company, that company, under the authority of a vote of its directors, bought fom the State Company 12,500 shares of the stock of the latter, and delivered its check of $500,000 for it. The court does not understand that any claim is now made for repayment of the $500,000, and the defendants' attorneys explain that the purchase was in fact an exchange of stock, not one for $500,000 in money. As the stock purchased had a market value of $35 to $38 a share, the National Fidelity Company received and held among its assets for the time being stock of the State Company of an aggregate market value of from $437,500 to $475,000. Five months later, on March 19th, 1931, the executive commitee of the Na-

tional Fidelity Company and the Standard Company made an exchange of this block of stock for 5,750 shares of Standard Company Class A stock and a cash payment of $75,000 to boot. The amount of $75,000 paid over by the National Fidelity Company was procured by the sale of interest bearing securities owned by that company. It is this $75,000 that is first alleged to have been improperly taken over from the Great National Company in the transaction. That company had, as a result of the exchange and payment, only a block of Standard Company stock, newly issued, and of no market value, carrying no voting rights, and in a company that had been in existence only two months and a half, and had a capital of only $1,000 and little business.

The subsequent course described for the $75,000 is this: A month after the exchange and passing of the money to the Standard Company, 1,875 additional shares of the State Company stock, which, according to the stock book stub, had been issued to M. B. Levin, were transferred to the Standard Company by erasure of the name of Levin and substitution of that of the Standard Company on the stub, and the check of the Standard Company for $75,000 was issued to Levin in payment. Levin, it is averred, had no interest in the transaction, and no knowledge of it, but signed papers at the request of Henry L. Sinskey. He appears to have deposited the check for the $75,000 to his own account and at the same time to have drawn his check for the full amount of it in favor of Henry L. Sinskey. Sinskey deposited the amount in bank to the credit of the Merchants' Association, another of the corporations at 215 East Fayette Street, controlled and managed by the Sinskey brothers, and that corporation at the same time opened a passbook of its own in the name of Levin for the amount. Levin on the next day indorsed the passbook in blank, and then the Merchants' Association erased the name of Levin and, without her knowledge, substituted that of Miss Segrist, the telephone operator, as trustee, the entry being, "M. Segrist, Trustee, No. 3." It is averred that

Miss Segrist is without any interest in the money, and that it is held deposited with the association for the Sinskey brothers. That association, one of the appellants, had a capital stock of three shares of $100 each; its officers were Feitelberg, Eisenberg, and Miss Bird, all of them nominees of the Sinskey brothers and acting for them as agents. The transactions, starting with the turning of the money over to Levin, all took place within three days, most of them on April 21st, 1931. It is to be noted that, as a result of the passing of the money to Levin in the first place, the Standard Company acquired for the time being, in its treasury, 1,875 shares of State Company stock alleged to have had a total market value of about $70,000, and to that extent the original exchange by the National Fidelity Company of State stock for Standard stock later gave the National Fidelity Company some value in its holding, but only about $70,000 at the time for the $437,500 or $475,000 of stock exchanged for it. And the stock was, according to the averments, subsequently passed to the ownership of the Sinskey brothers without consideration, as follows:

Adding the 1,875 shares acquired from Levin to the 12,500 acquired by the exchange with the National Fidelity Company, the Standard Company held altogether 14,375 shares of State Company stock. The 14,375 shares were divided and reissued on August 8th, 1931, 8,404 shares to a National Title Guarantee Company, ninety per cent. of the stock of which was owned by the State and Standard Companies together, and 5,971 back to the Standard Company again. After a new stock issue of the State Company, giving five new shares for one of the old, the National Title Guarantee Company appears as having transferred its portion to a Tri-State Investment Corporation at a price of $315,150. The Tri-State Corporation was another of the companies at 213 East Fayette Street, having as officers at that time Miss Segrist as president, Feitelberg as vice-president, and Miss Flick as secretary and treasurer. Two days after the transfer from the National Title Guarantee Company to

the Tri-State Corporation, all but two shares of the stock were transferred back to the National Title Guarantee Company for $315,126, the two shares being reissued to the Tri-State Corporation; and six days later the National Title Company charged the stock off in full on its books, placing no value on it. Subsequently, on October 29th, 1932, a certificate for 42,018 shares was issued by the State Company to Arthur I. Klein, and dealt with in connection with the remaining shares bought by the National Title Guarantee Company, transferred to Klein through another channel, as is now to be stated.

The new issue of five shares of State Company stock for one of the shares which the Standard Company did not pass to the National Title Guarantee Company gave the Standard Company a remnant holding of 29,855 shares. This was sold back to the State Company itself for $37,319, for which the State Company issued its check to Standard Company; and four days later it was passed by the State Company to Arthur I. Klein, as was the portion mentioned above.

These transfers placed under the name of Arthur I. Klein all the State Company stock, or the stock with a market value, originally purchased by the National Fidelity Company, and exchanged by it for the valueless stock of the Standard Company with $75,000 to boot. Klein is one of the individuals described in the bill as a mere agency of the Sinskey brothers in the transactions. And it is averred, in addition, that he indorsed the stock certificates in blank, and that all the stock just mentioned was included in a list of stockholders issued by Henry L. Sinskey and forwarded by him in December, 1932, to Delaware, the incorporating state of the State Company, and that a proxy for voting it at a stockholders' meeting was at the instance and request of Henry L. Sinskey signed by Miss Segrist in the name of Arthur I. Klein.

Not all the transactions in this chain are essentials of the complainant's charge of improper withdrawal from one of the constituents of the consolidated corporation of assets belonging to it, and to its creditors. An averment

of that bare fact is complete with the statement that persons in control of the two or more sides made the exchange which left the National Fidelity Company with valueless stock for its valuable stock and $75,000 of its money. The purport of so much is that persons in a position of double interest and power made a transfer of assets to the unjustifiable loss of those interested on one side and the unjustifiable gain of those on the other. The remaining averments tracing the disposition of the exchanged stock and the money go to identify the gainers by the transaction, and other parties defendant.

In all the averments so reviewed there may be facts left unconsidered. The demurring defendants urge that the presence on the board of directors of the National Fidelity Company and the State Company of other persons not concerned in it would have prevented the wrongful diversion of assets averred. And they urge other explanations of transactions outlined. But nevertheless it is definitely averred in the bill that the wrongful diversion took place, and the facts stated are consistent with that contention. That so many individuals and corporations should be subservient to the purpose, and that so many transfers should be made for it, is unusual, but it cannot be said to be impossible. That being true, the charge must, on the consideration of the demurrers, be treated as if established. Difficulties in establishing it, arising from the presence of nonparticipating persons on boards of directors or from other possibilities, if there are any, are difficulties in the way of sustaining the burden of proof, and are not before the court on the demurrers. *Safe Deposit Co. v. Coyle,* 133 Md. 343, 351, 105 A. 308. This court concurs in the conclusion that the ultimate essentials of the charge are stated, directly or by implication. Whether in respect to so much of the facts here there is any misjoinder or nonjoinder of parties, and whether the bill is multifarious, are questions which may be left for consideration after all the particular transactions complained of have been explained, and these and other questions raised by the demurrers are taken up. Neither here

nor elsewhere is it found necessary to consider any questions of contravention of the corporation laws of the State.

The second particular complaint recites many shifts of money and stock at or about the same times, with the ultimate result that $181,500 in money was taken from the National Fidelity Company, or the consolidated corporation, in exchange for 1,000 shares, the entire stock issue, of a holding company, which held only stock of the constituent companies themselves.

The holding company, the American National Real Estate Holding Corporation, was, according to the averments, one of the corporations at the Fayette Street offices, and was incorporated in Maryland in June, 1930. It is averred that it was an instrumentaltity for the accomplishment of the consolidation, and was used also for the diversion of assets described. At the end of the year 1930, the directors, and the executive committee, were Gerald Kerr, attorney, Miss Woodward, and Miss Flick, and there was one vacancy not thereafter filled. Mr. Kerr was the vice-president, and Miss Flick was the secretary and treasurer. There appears to have been then no president. The stock, 1,000 shares, was of no par value, the corporation did no business, and its only assets were stocks of the insurance companies owned and controlled by the Sinskey brothers, as previously averred.

The articles of consolidation exhibited with the bill were executed on February 11th, 1931, but the consolidation was being arranged during the latter part of the year 1930, and the exchange of old stock for stock of the new consolidated corporation was agreed to be made, so far as the National Fidelity Company was concerned, on the basis of stock issued and assets possessed on December 31st, 1930. Shortly before that date, the State Company, which owned 10,000 shares of the National Fidelity Company stock, made an exchange of them with the holding company for all the shares of the latter, 1,000 shares. The holding company then borrowed from the National Fidelity Company $156,500 in money to buy up stock of

the original Great National Company, the National Fidelity Company borrowing in its turn another $75,000 to make up the amount. The holding company transferred to the State Company $75,000, in repayment of a loan which had previously been made to the holding company to buy other stock of the original Great National Company. Still on the same day the holding company paid over the remainder of the $156,500, or $81,500, to the Berhenid Building & Loan Association, another of the corporations at 213 East Fayette Street, with three shares of stock owned and controlled by the Sinskey brothers, with a J. J. Harris as president, Miss Bird as vice-president, and Miss Woodward as secretary and treasurer, each holding one share and all constituting the board of directors. This corporation was taken over by the State Company in the same month, the State Company paying off all its free shareholders and the three stock subscriptions, and depositing $39,288.26 with it in a savings account to its own, to the State Company's credit. Continuing with the payment of the $81,500 into this association by the holding company, the amount was withdrawn and deposited in bank, and later, on January 12th, 1931, was again withdrawn and paid to the State Company in subscription to stock of the latter. Cancelling the subscription, on March 4th, 1931, the amount of $81,500 was paid back to the holding company with an additional $75,000 as a contribution to the holding company to be applied to its surplus. And the sum of the two payments, $156,500, or the amount borrowed by the holding company from the National Fidelity Company, was repaid to the latter, thus completing repayment of the loans.

On the same day, March 4th, 1931, there was another exchange made between the National Fidelity Company and the State Company. The former transferred to the State Company, for $368,500, 5,071 shares of National Fidelity Company stock, the issue of which had been authorized on December 29th, 1930, and the State Company transferred to the National Fidelity Company the 1,000 shares of the holding company stock for $550,000, giving

the State Company in the exchange 5,071 shares of the National Fidelity Company's stock and $181,500 of its money, made up of the $156,500 previously dealt in, and $25,000 more realized from a sale of more securities of the National Fidelity Company And the final outcome of the transactions was, as it is averred, that the National Fidelity Company, a constituent of the corporation now in the hands of the complainant, as receiver, appears as having exchanged $181,500 of its money and 5,071 shares of its stock for 1,000 shares of the stock of the holding company representing only more of its stock and stock of the other constituent.

The $25,000, it is averred, was deposited on the same day in the Merchants' Association, one of the corporations at 213 East Fayette Street, in two accounts of $12,-500 each, in Miss Segrist's name as trustee and designated respectively as, "No 103, M. Segrist, Trustee, No. 2, H," and "No. 104, M. Segrist, Trustee, No. 1, R." The initials H and R are alleged to be those of Henry L. Sinskey and Raymond A. Sinskey, respectively, and the money is alleged to be held for those two defendants. As in the consolidation, the stock of the National Fidelity Company was to be exchanged for new stock only, the payment of its cash into the treasury of the holding company was not made to effectuate the consolidation, it would appear, and an averment that the whole payment was a misappropriation as contended would not be inconsistent with the facts stated. And the averment of unjustified diversion and enrichment with the $25,000 is not excluded by the facts given. The averment is definitely made, and like averments of the first particular diversion contended for must, for the purposes of the demurrers, be treated as if established.

The remaining or third, particular transaction, according to the averments, took place later in the year 1931, after the consolidation had been completed, and a month or more before the original appointment of the receivers, and it is averred to have been a diversion of funds of the consolidated corporation, accomplished by deceit and by

the subsequent misuse of the money. The averments are these. During the fall of that year, and particularly on October 31st, the Sinskey brothers represented to the directors of the consolidated corporation, the Great National Company, that controlling interests in two other fire insurance companies, the People's Company of Frederick, and the Eastern Company of Atlantic City, New Jersey, could be purchased, but as the Great National Company was not a dividend paying corporation, the purchase could be made more advantageously by offering in exchange for stock of the two purchased companies stock of a corporation that was paying dividends; and the Standard Company was represented as such a corporation, actively engaged in the business of petty loans, and earning dividends of twenty per cent. on its stock, which was available for the purchase and exchange. This representation regarding the Standard Company was false and known by the Sinskey brothers to be false, and it was made for the purpose of inducing the purchase of that company's stock for acquiring the stock of the People's and the Eastern Companies. The Standard Company was, in fact, not actively engaged in the business of petty loans, and its business was not prosperous. On these representations the directors of the Great National Company, on October 31st, 1931, authorized the executive committee to purchase so much of the Standard Company stock, not exceeding $250,000 in amount, as might be necessary to acquire assets of the two insurance companies sought, either or both, and to pay the same price as that to be paid ultimately by the Great National Company  The resolution as voted by the directors was wrongly recorded by Howard C. Bregel among the minutes, he including no mention of the purpose to acquire the two insurance companies by means of the Standard Company stock after buying it. Thereafter, although the Great National Company had then stopped honoring drafts on it in settlement of policyholders' losses, that company paid over to the Standard Company for its stock $158,500. This was done by bank checks signed by Spencer B. Curry, president of

the Great National Company, as was customary, because of his frequent absence from Baltimore on business, extended at this time by illness. And the money was not used for the intended purpose of acquiring the two insurance companies, but was passed through the channels of corporations at the Fayette Street offices previously mentioned.

It would prolong the opinion intolerably to follow in detail the intermediate steps by which the appropriation of the money is alleged to have been carried out. The complainant charges that they were only pretended, not *bona fide* transactions, but transactions for the diversion and appropriation of the funds as complained. In brief, it is averred that in the end $100,000 was turned over to Henry L. Sinskey in cash; $46,500 was deposited in two accounts in the name of Feitelberg as trustee, and bearing designations of H and R, respectively, for the Sinskey brothers; $9,000 was deposited in another account in the name of Miss Segrist as trustee; $1,000 was loaned by Henry L. Sinskey to Wolman; and the remaining $2,000 was deposited in the Colonial Trust Company of Delaware to the account of the Standard Company. This was all done in three days, a number of the intermediate transactions, those which ended in paying $100,000 cash to Henry L. Sinskey, on one day.

The criticisms made of the averments, in addition to those of uncertainty and indefiniteness, are principally that under the circumstances they are improbable, and could not be found true in fact. They are not, however, rendered impossible by anything else in the bill, and they are made with sufficient clarity and definiteness. Therefore, whatever may be the difficulties in the way of the complainants establishing his case on the proofs, it seems to this court that these, like the other charges considered, must on the demurrers be treated as if established.

Passing from the sufficiency of the averments to show a wrongful diversion in the three transactions, the question then is whether, taking them as sufficient, they present a case for the remedies sought in the bill. The objec-

tions on the demurrers are few. It is contended (1) that the bill is multifarious; (2) that the prayer for an accounting was not supported by any previous demand for that relief; (3) that a mere chancery receiver is not competent to bring such a suit in a jurisdiction foreign to that of the first appointment; (4) that the allegations of fraud are not sufficiently specific; and (5) that there is an adequate remedy at law for any injury that might be proved. Two of the defendants set up each an additional ground of demurrer which will be discussed after the common grounds enumerated above have been taken up. The fourth ground, that of insufficiency of the averments to charge the fraud or diversion of funds, has already been considered in reviewing the averments.

The principle invoked in the objection that a bill is multifarious is one of convenience in the administration of justice. *Miller, Equity Procedure,* 134. And the court on the present bill would have before it a complex case of many principal and subsidiary transactions, participated in differently by many individuals and corporations. But the complexity would appear to exist in the number and variety of moves averred rather than in distinctness of the transactions and the actors in them. If there is to be any difficulty from distinctness in these, it must apparently be shown by answers and proof. In the bill it is averred that the actors were agencies of the two individual principals, without separate interests, mere channels. Therefore the case is one of two defendants and their agents in it acting together for single ends. The other defendants are proper parties to be given an opportunity to prove any independent interest of theirs which might be affected by the litigation, but the combination of them does not vitiate this bill either because of their number or because of the diversity in their participation. In several previous cases this court has had to deal with bills against many defendants participating in different parts of grievances averred, and found no objection on the ground of multifarious sustainable. *Emerson v. Gaither,* 103 Md. 564, 64 A. 26; *Atlantic Lumber*

*Corporation v. Waxman,* 162 Md. 191, 159 A. 593; *Scher v. Becker,* 163 Md. 199, 161 A. 167. And as for the number and diversity of the transactions attacked, there seems to be in the series of them, all within the space of a year, with one corporate body aggrieved, as it is averred, and members of a group acting in it under the direction of two heads, an approximate singleness that would render handling the complaint in one proceeding feasible. It is difficult, indeed, to see how the charges made could be dealt with in separate proceedings with fairness to both sides, so far as appears from the bill.

The defendants argue that the single suit would involve rescission of each one of the many transactions, with adjustments by return of considerations and otherwise, but that is on the supposition of the defendants that the transactions are in some degree independent, with separate interests in the participants, and that is not the theory of the bill. No prohibitive difficulty in the court's taking the matters charged under the one bill is now foreseeable, and this defense is not upheld.

The objection that the prayer for an accounting is not supported by an averment of previous demand and refusal of it is founded upon the observation in the opinion in 165 Md. 384, 169 A. 59, 67, that no insolvency of the defendants was shown, "nor is there any suggestion that they have been asked to account, nor that if asked that they could not or would not account to the plaintiff." What the court observed in that was a reason for refusing the appointment of a receiver and the granting of the other relief prayed on an *ex parte* application for it. As the court said in the prefatory sentence immediately preceeding, "the bill * * * fails to show with the centainty and clarity requisite in such a case any emergency or necessity sufficient to justify relief so severe and stringent." And, following the opinion up still further, it appears that in making this statement the court was assuming that the averments then before it might be "sufficient to establish such a *prima facie* case of fraud as to require the defendants to discover their transac-

tions with it [the Great National Company] and to account for any moneys unlawfully obtained from it," which is the question now brought before the court on the demurrers. It has never been regarded as essential to a bill for discovery and accounting that a previous demand and refusal be averred in the bill. Compare *Bentley v. Cowman*, 6 G. & J. 152, 155.

Whether, assuming the bill to be maintainable by the proper party complainant, the receiver of the Great National Company acting under the authority of the Maryland court is a competent complainant, is a question which was left undecided on the previous appeals, in the absence of information as to the scope of the original order for a receivership in the District of Columbia. 165 Md. 387, 169 A. 69. That original order, passed on December 18th, 1931, supplemented by a further order of the same court on November 16th, 1932, provided only for a chancery receivership, with no provision for dissolution of the corporation. And the order of the Circuit Court of Baltimore City, passed on a creditors' bill on December 19th, 1931, with its subsequent order of March 23rd, 1933, likewise provided for appointment of chancery receivers. A first objection is that only a statutory receiver, appointed in dissolution proceedings, would be competent to bring such a suit as this. Reference is made to the provision in the Code, art. 23, sec. 94, that only on dissolution can the receivers apply to set aside preferences, as in cases of bankruptcy or insolvency proceedings, and to the decision of this court in *Hughes v. Hall*, 118 Md. 673, 85 A. 946, that chancery receivers could not sue to recover funds which the president of the corporation had paid himself when the corporation was insolvent. Similar cases cited on the point are *Hayden v. Citizens' Bank*, 120 Md. 163, 87 A. 672; *Great Western Mining Co. v. Harris*, 198 U. S. 561, 574, 25 S. Ct. 770, 49 L. Ed. 1163; and *Quincy R. R. Co. v. Humphreys*, 145 U. S. 82, 95, 12 S. Ct. 787, 36 L. Ed. 632. The statute and the decisions cited, however, are concerned with setting aside preferential payments that would be unobjection-

able in law except for the discrimination among creditors of an insolvent or bankrupt, and the special statutory provisions applicable to such payments. *Drury v. State Capital Bank,* 163 Md. 84, 89, 161 A. 176. The court in *Hughes v. Hall* recognized that ordinary chancery receivers might, if authorized by the court, as here, sue to collect the assets committed to their charge. They might be very futile agents of the court for the collection if they could not. Similar recognition of their competency is found in other decisions. *Hughes v. Hall,* 117 Md. 547, 83 A. 1023; *Hammond v. Lyon Realty Co.,* 163 Md. 442, 459, 465, 163 A. 480.

It was next objected that where, as here, original receivers have been appointed in a foreign jurisdiction, those receivers only, and not the local receivers for assets in Maryland, would be competent to sue to collect those assets. But that objection is at odds with decisions of this court that local receivers might still be authorized to sue for local assets. *Stockley v. Thomas,* 89 Md. 663, 43 A. 766; *Castleman v. Templeman,* 87 Md. 546, 40 A. 275, 277; *Gaither v. Stockbridge,* 67 Md. 222, 9 A. 632, 10 A. 309. And see *Linville v. Hadden,* 88 Md. 594, 41 A. 1097. The general rule, indeed, is that the local receivers shall bring the suits, the allowance of suit by the foreign receivers being exceptional. "It is true that as a general rule the functions and powers of a receiver, for the purpose of litigation, are limited to the courts of the state within which he has been appointed, and that he has no extra territorial jurisdiction, and that such rule has been more than once announced by this court." *Castleman v. Templeman, supra; Bartlett v. Wilbur,* 53 Md. 485, 494; *Day v. Postal Telegraph Co.,* 66 Md. 354, 360, 7 A. 608. No ground for such an exception is urged in this case. The Maryland receiver is therefore found competent to prosecute the suit.

Contrary to the contention that an adequate remedy would be available to the receiver at law, it seems to this court almost obvious that any remedy at law would be inadequate. The cancellation of transactions, with any

adjustments found requisite, the incidental discovery and possibly complicated accounting and generally the righting of the elaborate diversions which the complainant undertakes to prove, seem to be beyond the capacity of a court of law. And so would be the handling of the claims against so many defendants with due relation to each other. *Wenstrom Co. v. Purnell,* 75 Md. 113, 23 A. 134; *Dillon v. Conn. Mutual Life Ins. Co.,* 44 Md. 386; *Hill v. Pinder,* 150 Md. 397, 414, 133 A. 134; *Sears v. Barker,* 155 Md. 323, 141 A. 908. The case cited by the defendants on this point, *Anderson v. Watson,* 141 Md. 217, 118 A. 569, is entirely in accord with this principle.

A further objection, departing somewhat from the specifications of grounds of the demurrers, is that the complainant has been guilty of laches, if he is not to be taken as having ratified some of the transactions complained of, in delaying his suit eighteen months after his appointment as receiver. On the face of the bill, evidently the product of much searching of records, eighteen months delay after taking charge as receiver would not appear to have been an extraordinarily long one for reaching the point of action on this one part of the receiver's duties; and the court does not see that any explanation is demanded, on the demurrer, to avoid the defense on this ground. There is no ground for assuming that the cause of action was discovered, or discoverable, short of the expiration of the eighteen months. And clearly, we think, no ratification could reasonably be inferred. *Safe Deposit Co. v. Coyle,* 133 Md. 343, 351, 105 A. 308; *Kaliopulus v. Lumm,* 155 Md. 30, 38, 141 A. 440; *Sears v. Barker,* 155 Md. 323, 330, 141 A. 908. This objection is not found well taken. And so much disposes of the grounds urged on all the demurrers in common.

The State Company on its demurrer urges, in addition, the fact that the alleged purchase by the National Fidelity Company in the first particular transaction of 12,500 shares of State Company stock for $500,000 was in fact an exchange of that stock for 10,000 shares of the stock of the National Fidelity Company, at that value; and this

being true, it is contended that no cause of action could arise from it. Such an additional fact could be brought into the case only by an answer, but the explanation has been allowed for earlier in this opinion, and need not be discussed further.

The Maurice Company demurs separately to a charge in a thirty-fourth paragraph of the bill averring that the assets of the defendant the Standard Company, although still belonging to that company, have been transferred to the Maurice Company, thus rendering the latter company liable under the bill. The objection on the demurrer is that in this there is no averment of lack of consideration in the transfer. But the paragraph avers that there was no transfer in that sense, no transfer of property rights, that is, which would require consideration. The averment is in effect that the transfer was nominal, and a concealment only. This implies lack of consideration. This ground, too, is found not well taken.

The conclusions so far announced on the contentions raised on the demurrers in this court lead the court to concur with the lower court in its rulings on those demurrers, which are the subject of the first of the ten appeals. The court's order on this first appeal will therefore be affirmed.

On the second appeal, the two building and loan associations question whether, after having had their demurrers to the bill sustained, so that they were released as defendants to the bill—although the bill was not ordered dismissed as to them—they were subject to the jurisdiction of the court for the passage of the later order impounding in their hands any assets of the remaining defendants. The order enjoined the two associations from paying out any of the funds on deposit with them for the other defendants. There seem to be two sufficient answers to this question. Persons not parties to the whole proceeding, or even not parties at all, may be, and commonly are, required to obey injunctions issued in it which, without affecting any rights of theirs, may aid the court in the accomplishment of the purposes of the litigation

between others. Incidental impounding of bank deposits is a familiar and long-established practice. *Binney's Case*, 2 Bland, 99, 108; *Stockett v. Goodman*, 47 Md. 54; *Lipskey v. Voloshen*, 155 Md. 139, 145, 141 A. 402. Depositaries made subject to such impounding orders have no interests of their own in the funds; or if they should in exceptional cases have any interest by lien or otherwise, it would be respected upon their showing the fact by their answers. Ordinarily, they are mere agencies, utilized much as a receiver is utilized for the purposes of the proceeding against the defendants as to the main prayers of the bill. And, moreover, being without interest, these incidental defendants, or stakeholders, as they may be called, cannot appeal. Affirmance or reversal of the order would not affect them. *Miller, Equity Procedure*, 429; *Hall v. Jack*, 32 Md. 253; *Scott v. Gittings*, 125 Md. 595, 604, 94 A. 209; *In re Buckler Trusts*, 144 Md. 424, 428, 125 A. 177. The second of the ten appeals will therefore be dismissed.

The motions, from the refusal of which the remaining eight appeals were taken, to rescind so much of the order or decree as overruled the demurrers, have been argued on four grounds: (1) That a mere chancery receiver cannot institute or prosecute such a bill; (2) that this inability in the Maryland chancery receiver cannot be cured by the subsequent addition of the foreign receiver as a party plaintiff; (3) that the receiver, having originally elected to sue in the case as a holder of stock of the Standard Company among the assets received, cannot be permitted later, as he now attempts, to attack the purchase of that stock, as a result of which it was included among those assets; and (4) that the receiver is estopped from prosecuting the suit because he has failed to disclose parts of transactions opposed to his contentions.

The first two grounds were set up on the demurrers, and are repeated here. Nothing more need be said on them. The fourth is in effect that the court, on the demurrers, should not confine its decision to the question of sufficiency of the averments made, but should take into

consideration additional facts of which it may be informed by the defendants without answering, which is, of course, opposed to the rule. The defendants must answer or defer reference to defending facts until after the averments of the bill have been tested at their face value. *Miller, Equity Procedure,* 169. The additional fact principally urged as an illustration of omissions by the complainant is that of the exchange of the 12,500 shares of State Company stock for 10,000 shares of National Fidelity Company stock, instead of a purchase, as it is stated in the bill, of the 12,500 shares for $500,000; and the defendants' explanation of the transfer has been accepted in this opinion without its being found to affect the complainant's contentions.

The remaining question of estoppel should also have been raised on the demurrers. The reply of the appellee is that to establish such an estoppel it would at least be necessary that the wrongs now averred should have been known to the complainant before the taking of the first position, and this could appear only by an answer, setting up the fact, which is denied by the appellee.

But there is no right of appeal from the orders denying these motions. The refusal of the court to reopen the order or decree on the demurrers was within its discretion, and the only result of it was to leave the original order undisturbed. That original order was the only ground of complaint and the only subject of appeal. *Miller, Equity Procedure,* 356; *Jacobs v. Bealmear,* 41 Md. 484, 487; *Fidelity & Deposit Co. v. People's Banking Co.,* 165 Md. 693, 696, 170 A. 554; *Gold Dust Corp. v. Zabawa,* 159 Md. 664, 666, 152 A. 500. These last eight appeals, too, must be dismissed.

> *Order or decree in No. 32 affirmed with costs, and appeals in the remaining nine cases dismissed.*